*T. E. Doolittle*, with whom were *A. B. Woodward* and *L. F. Beers*, for the petitioner.

*L. Warner, Jr.*, with whom was *G. H. Watrous*, for the respondent.

━━━◆◆◆◆◆━━━

## LANDOLT *vs.* CITY OF NORWICH.

How far a city is liable for ice on a side-walk, and what is reasonable care in removing it.

CASE, for an injury to the plaintiff from falling on ice upon a sidewalk of the defendant city. Tried in the Superior Court for New London County at its December term, 1871, holden at Norwich, upon the general issue, closed to the court, before *Seymour, J.* The case is sufficiently stated in the opinion.

*Wait, Holbrook* and *Swan*, for the plaintiff.

*Halsey* and *Pratt*, for the defendants.

SEYMOUR, J. The plaintiff claims damages for an injury suffered by him on Sunday, January 8th, 1871, by reason, as he says, of a defective sidewalk in the city. About 4 o'clock in the afternoon of that day, while walking along Union street, he slipped and fell, receiving an injury of some severity. It is clear that the ice was the cause of the accident, and the only question in the case is, whether the condition of the sidewalk was such as under the circumstances to subject the city to damages.

The rule of law on the subject, as recently settled by the Court of Errors, is, that some duties may devolve on cities and towns in regard to ice, and that what those duties are

cannot be definitely defined by law, but must in each case depend upon all the circumstances of it; the general rule being that towns and cities must use reasonable care to make their streets safe for public travel, whether on foot or in carriages.

The facts are briefly these: The street is one of considerable public travel. The plaintiff was walking upon a well-constructed pavement in front of premises occupied by Mr. Greenwood. The lands adjoining this street are such-as to require more than ordinary care to prevent the water from overflowing the sidewalk, and prior to the winter when the accident happened the overflow had been troublesome; but in 1870 underdrains had been made at considerable expense, by which most of the water was thoroughly carried off. At about the place where the accident happened the drive-way of Mr. Nichols crosses the pavement, and water running along the sides of the drive-way had been frozen. There was no complaint on the part of the plaintiff that the pavement was not properly constructed in itself, or in reference to the adjoining grounds. On the other hand everything seems to have been done that could reasonably be required in making the pavement safe and convenient.

Friday, the 6th, had been rainy. Saturday was pleasant but cold, the thermometer at 1 P. M. standing at 34 degrees. Sunday was fair in the forenoon, but between noon and 4 P. M. about half an inch of snow fell and covered the ice on which the plaintiff slipped. No one testified to having seen any ice on the pavement on Friday. Mr. Nichols, who seems to have had means of knowledge, testifies with confidence that there was not a particle of ice there on that day. He says that on Sunday morning he first noticed it, and he describes it as a thin scale of ice about a yard square, which appeared to be caused by water that during the night or perhaps the afternoon of Saturday had overflowed the surface drain of the drive-way. I am inclined to think Mr. Nichols's account substantially correct. The plaintiff, indeed, and the gentleman who was with him at the time he fell, think the patch of ice was larger and thicker than described by Mr. Nichols. But

their attention was absorbed by the hurt which the plaintiff had received, and by reason of the ground being covered with snow their means of knowledge were limited.

The question then is, whether on these facts neglect is fairly imputable to the city. Could it reasonably be expected and required that this piece of ice should receive the attention of the street commissioner during the time it was on the walk?

The plaintiff claims that by simply casting ashes or sand on the place it would have been made safe, and that the city ought to be on the watch for such dangerous places and apply the proper and easy remedy without delay.

The defendants on the other hand insist that particles of ice like that which caused this accident are ordinarily not dangerous; that it probably did not extend across the sidewalk; that room was left for safe walking without going upon it; and that had it not been for the snow which was falling, and which hid the ice from the plaintiff's view, he would have passed in safety. The defendants also insist that the public authorities had no notice of the condition of the sidewalk, and that it would be unreasonable to require of them that they should be constantly on the watch for such places of slight peril, and apply immediate remedy to them.

Such patches of ice on sidewalks are abundant during the winter weather, formed by rain and melting snow, and leakage of conductors, and imperfect drainage, and the ice so formed is subject to rapid change of place and condition. The removal of it, or covering it with sand and ashes on all the sidewalks of the city, is a matter requiring time and involving no trifling expense. Constant repetitions of the labor are usually needed every winter. During the past week, on three occasions, the walks here were no sooner cleared after a storm than a succeeding storm again covered the earth with snow and ice.

In our country villages snow and ice are generally suffered to remain as they are left by the laws of nature. Volunteer forces of public spirited citizens sometimes attend to places of more than usual peril or difficulty, but the selectmen, as such, seldom interfere. The pedestrian in the country is

rarely in the winter exempt from perils by ice, but with good heed he seldom meets with an accident. The peril is not such as to warrant the great expense in a sparsely inhabited village, of attempting a preventive or a remedy; but in cities the aggregate of peril by reason of the numbers exposed to it becomes considerable, and the means of meeting the needful expense are ample; and hence in cities the public as such properly undertake the duty of doing the best they can to provide against the dangers to travel which winter in this climate necessarily brings with it. The city of Norwich has entered on the performance of this duty, and must be held to perform it with ordinary diligence and care. Well cleared pavements are justly felt to be convenient and necessary, and I would not under-estimate the importance of due attention to their safety, especially here where the peril of slipping is greatly increased by the grade of the streets.

It cannot, however, be the rule of duty that all the sidewalks shall at all times be kept absolutely free from ice. Such a rule would involve expense disproportioned to the object to be accomplished. The street commissioner testifies that he first attends to the front of public buildings and to public squares and places, and to the front of vacant lots, trusting that, by force of a city ordinance to that effect, individual citizens will promptly attend to the pavements adjacent to their occupied premises; the commissioner himself taking, however, a general oversight of the whole city, and applying the remedy in case of an occupant's neglect; and he probably does, what was not distinctly stated by him, direct his early and more particular attention to places where travel is most concentrated, as in the approaches to the post-office, depot, market places, and the like.

The course adopted by the commissioner seems to be correct and reasonable, and to have been faithfully executed; and in view of all the facts and considerations applicable to the subject, I think the city is not chargeable with neglect in respect to the particular piece of ice in question. Such spots will escape the most careful vigilance for at least a few days. It is not reasonable to expect that every square yard

of pavement in the city will be reached and cared for by the commissioner. No one has testified that he saw the ice and regarded it as dangerous. Mr. Nichols, the only witness who testified to having seen it at all, evidently considered it as requiring no immediate attention.

Under these circumstances I cannot say the city is in fault, and while I regret the injury the plaintiff suffered, must find the issue for the defendants.

---

# RULES

## WITH REGARD TO THE PREPARATION OF CASES FOR THE SUPREME COURT OF ERRORS.

Adopted at the October Term, New London County, 1870.

### I.

The questions intended for revision by the Supreme Court must be questions of law. The court will not revise any question of fact, whether it be the principal fact or issue in the case, or any other.

### II.

Those questions must appear on the record, either, first, in the finding of the court, or second, in a bill of exceptions, or third, in a motion for a new trial. Bills of exception however are not favored, and the question should appear in the finding of the court, or in a motion for a new trial.

### III.

It must further appear on the record that the question was distinctly raised as a question of law on the trial below, and was decided by the court adversely.

### IV.

The statutory motion in error is a short substitute for a writ of error, and is of the same nature, and is a process and not part of the record. Errors existing in the record may

be assigned, that is, pointed out, in it, but they cannot be raised in it by allegations in relation to what took place at the trial. What is called the general assignment of error, that the judgment should have been the other way, is not necessarily an assignment of errors in law, and cannot be regarded. A special assignment of each particular error should be made.

It is apparent from the foregoing that when counsel propose to carry their cases to the Supreme Court, they should see whether the finding distinctly shows that the questions of law intended for revision were raised and decided on the trial. If it does, they may move in error, or file a motion for a new trial, embodying so much of the finding as may be necessary to show that the questions were raised and decided. But if it does not clearly appear in the finding that the questions were, in fact, raised and decided, a motion in error is not proper and will be fruitless. The question in such a case should be raised and presented on the record by a motion for a new trial.

# APPENDIX.

## OBITUARY NOTICE OF JUDGE DUTTON.*

HENRY DUTTON, late a Judge of the Supreme Court of Errors and of the Superior Court of this state, and a former Chief Magistrate of the state, died at his residence in the city of New Haven on the 26th day of April, 1869. A sagacious lawyer, a successful advocate, one of the leaders of the Connecticut bar, and, later, an able and honored Judge, it is eminently fitting that these pages should embody a brief tribute to his memory.

Judge DUTTON was born in Watertown, in this state, on the 12th of February, 1796. His early opportunities for education were limited to the

*Prepared at the request of the Reporter, by Louis H. Bristol, Esq., of the New Haven County bar.

advantages ordinarily possessed by a farmer's boy, but an eager desire for self-improvement led him to qualify himself for admission to Yale College, where he was graduated with honor in 1818.

After graduation he studied law with the Hon. Roger Minott Sherman, in Fairfield, at the same time teaching in the village academy in that place. Subsequently he filled the position of tutor in Yale College for two years, and in 1823 commenced the practice of his profession at Newtown in Fairfield County. From that time down to the date of his elevation to the bench Judge Dutton's professional life was, in a pre-eminent degree, an active and laborious one. Associated at the outset of his career with such men of distinguished ability as Roger M. Sherman, Thaddeus Betts, Charles Hawley, Reuben Booth, and others who then composed the bar of Fairfield County, Judge Dutton never doubted his own ultimate success. The event justified his anticipation. Entirely devoted to the duties imposed upon him by his profession, he grew steadily in knowledge, power and reputation, until he at last became the acknowledged head of the bar of his adopted county.

In 1837 Judge Dutton removed from Newtown to Bridgeport. His life in the latter place was one of great professional activity, as will be readily seen by a reference to the Connecticut Reports. The purity of his private life, the eminence of his legal acquirements, and his professional successes, gave him a deep hold on the confidence of the community, and he was, in consequence, made the recipient of many public offices; among others he held the position of State Attorney for Fairfield County, and on numerous occasions represented the interests of Bridgeport in the State Legislature.

In 1847 Judge Dutton accepted an invitation from the Corporation of Yale College to fill the chair of Kent Professor of Law in the Yale Law School, and thereupon removed to New Haven. In addition to the duties of his professorship, Judge Dutton continued after his removal to engage in active practice both in New Haven and Fairfield Counties, and during one year acted as Judge of the New Haven County Court. He also, during the same period prepared and published his Revision of Swift's Digest, and assisted in preparing the Revisions and Compilations of our Statutes in 1849, 1854, and 1866. He also found leisure to devote to political affairs, and in 1854 was elected Governor of the state by a vote of the legislature, the people having failed to effect a choice at the preceding spring election.

In 1861 Judge Dutton was chosen a Judge of the Supreme Court of Errors, and of the Superior Court, to fill the vacancy occasioned by the retirement of the late Judge Ellsworth. He remained on the bench as associate Judge of the Supreme Court until he reached the age of seventy, upon the 12th of February, 1866. After leaving the bench he devoted his energies chiefly to duties connected with the Law School, though engaging to some extent in general practice, until his death in the spring of 1869.

Judge DUTTON devoted himself most earnestly and assiduously to his profession, and few men in the state have ever achieved higher distinction in it. Without being a profound student of the law he had a mind well stored with legal principles, a remarkably extensive and accurate knowledge of adjudged cases, wonderful readiness in their application, great quickness of perception, much fertility of resource, and a happy audacity in asserting and maintaining new lines of legal thought which made him a most formidable antagonist.

As an advocate he possessed great power, not only in presenting questions of fact to a jury, but also in the discussion of purely legal questions before the court. His devotion to the interests of his clients was unbounded and no labor was too arduous if he could thereby protect their rights or secure their success. His mind was eminently a practical one. Trained by a large and varied experience in the ordinary affairs of life, it discarded mere theories, and yet was ready to accept of any innovations upon established usage that approved themselves to his common sense. To his practical sagacity while a member of the legislature is largely due that fundamental change in our law of evidence permitting parties in interest to testify—an improvement in the law which the state of Connecticut had the honor to pioneer.

As a Judge he was always courteous, accommodating and prompt in the despatch of business; quick to reach conclusions, his mind readily received new impressions and was not tenacious of an opinion once formed. By his impartiality, intelligence and ability he commended himself in the discharge of his judicial duties to his brethren of the bench and bar.

To his worth as a man no tribute need be paid; his character in every relation of life was most exemplary; he was everywhere an upright, generous and kindly hearted man; he lived an useful and successful life, and, dying, left an honored name.